PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PLANNED PARENTHOOD OF SOUTH
CAROLINA INCORPORATED; RENEE
CARTER,

*Plaintiffs-Appellees,*

v.

B. BOYKIN ROSE, in his official
capacity as the Director of the
Department of Public Safety of the
State of South Carolina; JON E.
OZMINT, in his official capacity as
the Director of the Department of
Corrections of South Carolina; KIM
S. AYDLETTE, in her official capacity
as the Director of the Department of
Social Services of South Carolina,

*Defendants-Appellants.*

No. 03-1118

LIBERTY COUNSEL; LOUISIANA
LAWYERS FOR LIFE; LOUISIANA
FAMILY FORUM; LOUISIANA LAW &
JUSTICE FOUNDATION,

*Amici Supporting Appellant.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
William O. Bertelsman, Senior District Judge for the
Eastern District of Kentucky, sitting by designation.
(CA-01-3571-23-2)

Argued: September 23, 2003

Decided: March 22, 2004

Before LUTTIG, MICHAEL, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Michael wrote a separate opinion and announced the judgment. Judge Luttig wrote an opinion concurring in the judgment. Judge Gregory wrote an opinion concurring in the judgment.

## COUNSEL

**ARGUED:** Tracey Colton Green, Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellants. Carrie Y. Flaxman, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, for Appellees. **ON BRIEF:** Henry McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellants. Roger Evans, Donna Lee, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York; Peter L. Murphy, LAW OFFICES OF PETER L. MURPHY, Columbia, South Carolina; Michael P. O'Connell, STIRLING & O'CONNELL, P.A., Charleston, South Carolina, for Appellees. Mathew D. Staver, Erik W. Stanley, Joel L. Oster, Anita L. Staver, Rena M. Lindevaldsen, LIBERTY COUNSEL, Longwood, Florida, for Amicus Curiae Liberty Counsel. J. Michael Johnson, ALLIANCE DEFENSE FUND, Shreveport, Louisiana, for Amici Curiae Lawyers for Life, et al.

## OPINION

MICHAEL, Circuit Judge, writing separately in parts I, II, and III and announcing the judgment in part IV:

South Carolina has a statute that authorizes a specialty license plate imprinted with the words "Choose Life." A comparable plate with a pro-choice message is not available. Planned Parenthood of South Carolina, Inc. (PPSC) and Renee Carter have sued three South Caro-

lina officials on First Amendment grounds, claiming that the statute authorizing the Choose Life plate amounts to viewpoint discrimination by the State. The district court agreed and declared the statute unconstitutional. We affirm in three opinions, with Judge Luttig and Judge Gregory each writing separately to concur in the judgment.

I.

In 2001 the South Carolina legislature enacted a statute, *see* S.C. Code Ann. § 56-3-8910 (the Act), that authorizes the issuance of a specialty license plate bearing the message "Choose Life." The Act directs the Department of Public Safety (DPS) to begin production of the plate when it receives either 400 prepaid applications or a deposit of $4000 from an interested individual or organization. S.C. Code Ann. § 56-3-8910(C). Sale of the Choose Life plate is expected to generate additional revenue for the State; the fee for the special plate is seventy dollars every two years in addition to the regular fee. *Id.* § 56-3-8910(A). Proceeds from the sale of the Choose Life plate are to be placed in a special account administered by the Department of Social Services (DSS). *Id.* § 56-3-8910(B). The DSS may award grants from this account to local, private nonprofit organizations that provide "crisis pregnancy services," but grants may not go to "any agency, institution, or organization that provides, promotes, or refers for abortion." *Id.* The Act makes the Choose Life plate available to any interested vehicle owner in the State. *Id.* § 56-3-8910(A).

South Carolina also has a more general statute that authorizes the issuance of specialty license plates to nonprofit organizations. *Id.* § 56-3-8000. An organization interested in obtaining a specialty plate may apply to the DPS by submitting proof of its nonprofit status along with 400 prepaid applications or a $4000 deposit, a design for the plate, and a marketing plan for its sale that is subject to DPS approval. The plate may bear only the "emblem, a seal or other symbol" of the organization that the DPS "considers appropriate," *id.* § 56-3-8000(A), and the DPS has the discretion to "alter, modify, or refuse to produce" any organizational plate that "it deems offensive or [that] fails to meet community standards," *id.* § 56-3-8000(H). Finally, the plate is available only to certified members of the organization.

Additional statutory provisions authorize various other specialty plates, most of which recognize veterans or members of civic organizations; these plates can be issued only to the designated honorees or organization members. *See, e.g.*, *id.* § 56-3-3310 (recipients of Purple Heart); § 56-3-2810 (volunteer firemen); § 56-3-5910 (Pearl Harbor survivors); § 56-3-5350 (Normandy invasion survivors); § 56-3-7860 (Shriners). Other plates, such as those bearing messages of state pride, are authorized for issuance to any vehicle owner. *See, e.g.*, *id.* § 56-3-3950 (authorizing the "Keep South Carolina Beautiful" plate). None of these plates, however, bears a message on a politically controversial subject.

PPSC never applied for an organizational plate (one with only an emblem or symbol) under S.C. Code Ann. § 56-3-8000. However, in 2001, when a bill to authorize the Choose Life plate was being considered at a subcommittee hearing in the South Carolina House of Representatives, a PPSC representative testified that the bill should be amended to add a "provi[sion] for a license plate for automobile owners who wish to express [the pro-choice] view." J.A. 29-30. That bill died in committee. A bill to authorize the Choose Life plate was also introduced in the South Carolina Senate in 2001, but consideration of the bill was blocked by parliamentary objections. Later on in the 2001 legislative session, a bill authorizing a NASCAR specialty license plate was amended to provide for the Choose Life plate; the amended bill passed both houses in June 2001 and was signed into law by the Governor in September of that year. It does not appear that any pro-life organization initiated the idea of a Choose Life plate. Rather, the statutory provision for the plate (the Act) came about because of the perseverance of two legislators who were acting on their own initiative.

There are notable differences between the Act authorizing the Choose Life plate and § 56-3-8000, which authorizes specialty plates for nonprofit organizations. First, the Act authorizes a plate bearing a specified message, but § 56-3-8000 authorizes plates bearing only the symbol or emblem of an organization. Second, the Act authorizes the issuance of the Choose Life plate to any interested person, but § 56-3-8000 authorizes the issuance of an organizational plate only to certified members of an organization. Finally, § 56-3-8000 does not automatically entitle an organization to its own plate; the section vests

certain discretion in the DPS to reject an application or to modify the proposed symbol. S.C. Code Ann. § 56-3-8000(H).

Within days after the Act went into effect, the plaintiffs (PPSC and Carter) filed suit seeking declaratory and injunctive relief against the state officials (the State) charged with administering the Choose Life license plate program and with distributing the proceeds from the sale of the plate. Plaintiff PPSC is an organization that provides family planning services to women, including first-trimester abortions and abortion referrals. Plaintiff Carter is a South Carolina resident who owns a passenger car registered in that state. The plaintiffs claim, among other things, that the Act violates the First Amendment because it regulates access to a speech forum on the basis of viewpoint. Both sides moved for summary judgment on the merits, and the State in addition claimed that the plaintiffs lacked standing to sue. The district court concluded that the plaintiffs had standing and granted their motion for summary judgment, holding that the Act discriminates based on viewpoint in violation of the First Amendment. *Planned Parenthood of S.C., Inc. v. Rose (PPSC)*, 236 F. Supp. 2d 564 (D.S.C. 2002). The State appeals, and our review is de novo. *Higgins v. E.I. DuPont de Nemours and Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).

## II.

The threshold question is whether the plaintiffs have standing to challenge the Act. Standing doctrine is "an amalgam of prudential as well as constitutional concerns." *Finlator v. Powers*, 902 F.2d 1158, 1162 (4th Cir. 1990). The constitutional concern about standing is rooted in Article III, which limits federal court jurisdiction to actual "cases" and "controversies." A justiciable case or controversy requires a "plaintiff [who] has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). Thus, to establish standing, a plaintiff must show (1) an actual or threatened injury (2) that was caused by the putatively illegal conduct of the defendant and (3) that is likely to be redressed by a favorable decision. *Heckler v. Mathews*, 465 U.S. 728, 738 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

One injury the plaintiffs allege is the discriminatory treatment they suffer from the State's use of the license plate forum to promote one political viewpoint (pro-life) in the debate about abortion. The plaintiffs allege that the Act authorizing the Choose Life plate causes the discriminatory treatment by allowing pro-life supporters, but not pro-choice supporters, to express their viewpoint in the license plate forum. They further assert that striking down the Act would redress the discrimination even though this remedy would not grant them access to the license plate forum. The plaintiffs are correct.

Discriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes. *Heckler*, 465 U.S. at 738; *Baker v. Carr*, 369 U.S. 186, 207 (1962). Moreover, plaintiffs in discrimination cases may seek equal treatment in the form of a level playing field, regardless of whether this is achieved by extending benefits to the disfavored group or by denying benefits to the favored group. *Heckler*, 465 U.S. at 738-39. For instance, in *Regents of University of California v. Bakke*, 438 U.S. 265, 281 n.14 (1978), the Supreme Court explained that a medical school applicant who was denied admission had standing to challenge the school's race-based admissions policy regardless of whether he showed "that he would have been admitted in the absence of the [admissions policy]." The applicant in *Bakke* met "the constitutional requirements" of standing because he had been denied a chance to compete for admission on equal terms. *Id.* Similarly, the Court said in *Heckler v. Mathews* that it "frequently entertained attacks on discriminatory statutes or practices even when the government could deprive a successful plaintiff of any monetary relief by withdrawing the statute's benefits from both the favored and the excluded class." 465 U.S. at 738. *See also Orr v. Orr*, 440 U.S. 268 (1979) (male plaintiff had standing to challenge discriminatory system of alimony payments even though the result of the challenge might be to impose the burden of payment on both women and men rather than to eliminate the burden of payment on men).

This level playing field analysis, though typically seen in equal protection cases, also applies in First Amendment cases. Just as a plaintiff claiming discrimination under the Fourteenth Amendment has standing to seek a level playing field, so too does a plaintiff claiming viewpoint discrimination under the First Amendment. *See*

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101-02 (1972); J. Nowak & R. Rotunda, *Constitutional Law*, §§ 2.12, 16.11 (6th ed. 2000). In short, where, as here, plaintiffs challenge a law on the ground that it promotes an opposing political viewpoint above their own, they suffer a cognizable injury that can be redressed by the invalidation of that law.

The plaintiffs also allege as an injury their inability to obtain a pro-choice license plate, but this does not entitle them to standing. The plaintiffs have never been able to obtain a South Carolina license plate that bears words with the pro-choice message. Thus, their inability to obtain a pro-choice plate was not caused by the enactment of the Choose Life Act, nor would this alleged injury be redressed by invalidating the Act. *See Linda R.S. v. Richard D.*, 410 U.S. 614 (1973). Moreover, characterizing the relevant injury as the inability to obtain a license plate obscures the constitutional nature of the harm in this case. There are no doubt people in South Carolina who would like to order a particular specialty plate that the legislature has not seen fit to authorize. But this case is not about people seeking to obtain license plates bearing the messages of their choice; it is about whether, by enacting the Choose Life Act, the State has impermissibly favored one viewpoint over another. Therefore, the sounder approach is to recognize discriminatory treatment as the actual injury and to accord the plaintiffs standing on that basis.

The State's arguments against standing are not convincing. The State first claims that the plaintiffs have suffered no injury because the Act, though failing to authorize expression of the opposing viewpoint, does not prohibit it. This contention ignores the obvious. Although the expression of the plaintiffs' pro-choice viewpoint is not explicitly prohibited, it is effectively prohibited. A person whose preferred plate is not authorized by the State cannot, as an alternative, display a privately manufactured license plate that bears the message of her choice. Specialty license plates are a state-controlled medium of expression; whatever speech is not authorized by the State is therefore prohibited. *See, e.g.*, S.C. Code Ann. §§ 16-21-50, 56-3-1370. Further, the State fails to recognize that the plaintiffs need not show an explicit prohibition on their speech in order to claim discriminatory treatment. *See Rosenberger v. Rectors and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). In *Rosenberger* the Supreme Court made

clear that "government regulation may not favor one speaker over another." *Id.* The plaintiffs may therefore base their claim of injury on the State's unequal treatment of two viewpoints in the abortion debate, specifically, its promotion of only the pro-life view.

The State also claims that the plaintiffs suffered no injury (that is, no discriminatory treatment) because they failed to apply for a license plate under § 56-3-8000, the law governing specialty plates for non-profit organizations. The plaintiffs' failure to apply for an organizational plate is not fatal to their standing to challenge the Act. Even assuming that the plaintiffs would have been able to obtain an organizational plate, such a plate would not allow an expression that is equivalent to the Choose Life plate. Under the current statutory scheme, any pro-life South Carolina driver can display a plate bearing the Choose Life message. In contrast, a pro-choice South Carolina driver could, at best, display a plate bearing the emblem of a pro-choice organization, assuming she was a certified member of that organization. Therefore, the complained-of unequal treatment (or discrimination) would persist regardless of whether the plaintiffs actually applied for or even obtained an organizational plate.

Moreover, waiting for the plaintiffs to apply for a specialty plate under the organizational statute would neither change the plaintiffs' stake in the controversy nor sharpen the issues for review. We addressed this sort of situation in *Finlator v. Powers*, where the plaintiffs challenged a discriminatory tax law without first protesting the payment of the tax with the top state tax official. In that case we said that requiring the plaintiffs to protest the tax and then refile their suit would not improve the "parties' advocacy . . . clarify the legal issues presented for review . . . or . . . contribute in any way to our ability to decide a question presented and contested by parties." *Finlator*, 902 F.2d at 1162. As a result, we concluded that the plaintiffs had standing to bring a facial challenge to the law. For the same reason, the plaintiffs in this case need not first apply for, and be denied, an organizational plate in order to gain standing.

Finally, a note on the prudential front: because the plaintiffs are a pro-choice organization and an individual seeking a pro-choice license plate, they are appropriate parties to challenge the Choose Life Act. If we were to deny standing to the plaintiffs, it is unlikely that

anyone would have standing, and the Act would effectively be immune from attack. *See Orr*, 440 U.S. at 272 (granting standing after recognizing the possibility that a statute would otherwise be immune from attack).

In sum, the plaintiffs have alleged a sufficient personal stake in the outcome of this controversy to warrant their invocation of federal jurisdiction to challenge the Act.

III.

A.

The First Amendment question before us is whether the State engaged in impermissible viewpoint discrimination when it authorized, through the Act, a license plate with the Choose Life message. The usual first step in answering such a question is to classify the relevant message as either government speech or private speech. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001); *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles (SCV)*, 288 F.3d 610, 616 (4th Cir. 2002); *PPSC*, 236 F. Supp. 2d at 570. This threshold inquiry is generally dispositive in viewpoint discrimination cases because of three common assumptions: first, that all speech is either government speech or private speech; second, that when the government speaks for itself and is not regulating the speech of others, it may discriminate based on viewpoint; and third, that the government may not discriminate based on viewpoint when it regulates private speech. As the Supreme Court explained in *Rosenberger v. Rectors and Visitors of University of Virginia*, 515 U.S. 819, 833 (1995), when the government speaks for itself, it "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." In contrast, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Id.* at 828. Not surprisingly, the State claims that the Choose Life message on the license plate is government speech; the plaintiffs claim just the opposite.

Our court recently grappled with whether speech was government or private in another case involving a specialty license plate. *See SCV*, 288 F.3d 610. There we acknowledged that "[n]o clear standard has

yet been enunciated in our circuit or by the Supreme Court for determining when the government is 'speaking' and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so." *Id.* at 618. In *SCV*, the Sons of Confederate Veterans (SCV), a nonprofit organization, applied under a Virginia statute for a specialty license plate to be issued to its members. Although the Commonwealth of Virginia authorized issuance of an organizational plate to members of the SCV, it prohibited the plate from bearing the SCV emblem because the emblem included the Confederate flag. We concluded that the restriction prohibiting display of the organization's emblem, though neutral on its face, was in fact discriminatory because it was aimed at the suppression of the SCV's viewpoint. *Id.* at 623-26.

In deciding whether the affected speech was government speech or private speech, we borrowed a four-factor test from other circuits that examines: "(1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech." *SCV*, 288 F.3d at 618 (internal quotation marks omitted). Applying these factors, we held that the affected speech — the plate design and emblem of the Sons of Confederate Veterans — was private speech. *Id.* at 621. Therefore, we struck down the emblem restriction as viewpoint discrimination against private speech within the specialty license plate forum. *Id.* at 626-27.

The plaintiffs argue that *SCV* controls the present case and dictates a finding of private speech. The State, on the other hand, argues that *SCV* is sufficiently distinguishable to warrant a finding of government speech. The district court did not explicitly apply the four-factor *SCV* test to this case; rather, it interpreted *SCV* as holding that "specialty license plates embod[y] private, not government speech." *PPSC*, 236 F. Supp. 2d at 571. In doing so, the district court overlooked an important difference between this case and *SCV*. In *SCV* the Commonwealth of Virginia acted as regulator of the existing specialty license plate forum. In response to a private organization's request for its own plate, the Commonwealth authorized, but modified, the plate to prevent the display of the Confederate flag. In this case, on the

other hand, the State acts as a covert speaker within the specialty license plate forum, creating a license plate that promotes one viewpoint in the abortion debate at the expense of another. I draw the following two conclusions from this difference. First, I conclude that applying the *SCV* test to this case produces an indeterminate result, one suggesting that the Choose Life plate embodies a mixture of private and government speech. Second, I conclude that despite the element of government speech on the Choose Life plate, the Act violates the First Amendment. My analysis follows.

I begin by applying the *SCV* test to determine whether the speech at issue can be characterized as either government or private speech. First, I consider the purpose of the Act. The State argues that the Act's purpose is to promote the State's preference for the pro-life position, and I agree. The plate with the Choose Life message came about through legislative initiative that culminated in a bill that was passed by both houses and signed into law by the Governor. The Act makes the Choose Life plate available to any interested vehicle owner and provides that proceeds from the sale of the plate will be distributed to local pregnancy crisis organizations, but not to family planning organizations that provide or promote abortion services. S.C. Code Ann. § 56-3-8910(B). Unlike in *SCV*, where the purpose of the challenged law was to "produce revenue while allowing . . . for the private expression of various views," *SCV*, 288 F.3d at 619, the purpose of the Choose Life Act is specifically to promote the expression of a pro-life viewpoint. The first *SCV* factor therefore weighs in favor of a government speech designation.

When I analyze the second *SCV* factor, the degree of editorial control over the content of the plate, I conclude that here, too, the facts are distinguishable from *SCV*. The *SCV* plate was sought and designed by the plate's private sponsor, the organization itself. *Id.* at 621. Here, the idea for a Choose Life plate originated with the State, and the legislature determined that the plate will bear the message "Choose Life." The State thus exercises complete editorial control over the content of the speech on the Choose Life plate. As a result, the second factor also weighs in favor of finding government speech.

Finally, I consider the third and fourth factors of the *SCV* test: the "identity of the literal speaker" and "whether the government or the

private entity bears the ultimate responsibility" for the speech. *SCV*, 288 F.3d at 621. As to the third factor, I note, as our court did in *SCV*, that the Supreme Court has held that even messages on standard license plates are associated at least partly with the vehicle owners. *Id.* at 621; *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (holding that vehicle owner had First Amendment right to cover the "Live Free or Die" motto on New Hampshire plate). This association is much stronger when the vehicle owner displays a specialty license plate. Although a specialty license plate, like a standard plate, is state-owned and bears a state-authorized message, the specialty plate gives private individuals the option to identify with, purchase, and display one of the authorized messages. Indeed, no one who sees a specialty license plate imprinted with the phrase "Choose Life" would doubt that the owner of that vehicle holds a pro-life viewpoint. The literal speaker of the Choose Life message on the specialty plate therefore appears to be the vehicle owner, not the State, just as the literal speaker of a bumper sticker message is the vehicle owner, not the producer of the bumper sticker. The same reasoning leads me to conclude (under the fourth *SCV* factor) that the private individual bears the ultimate responsibility for the speech on the Choose Life plate. Although the Choose Life plate was made available through state initiative, the private individual chooses to spend additional money to obtain the plate and to display its pro-life message on her vehicle. The last two *SCV* factors thus weigh in favor of finding private speech.

Although the district court concluded that the speech in this case was private speech under *SCV*, I conclude that *SCV*'s four-factor test indicates that both the State and the individual vehicle owner are speaking. The State speaks by authorizing the Choose Life plate and creating the message, all to promote the pro-life point of view; the individual speaks by displaying the Choose Life plate on her vehicle. Therefore, the speech here appears to be neither purely government speech nor purely private speech, but a mixture of the two. *See Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 305 F.3d 241, 244-45 (4th Cir. 2002) (suggesting that it is an "oversimplification [to assume] that all speech must be either that of a private individual or that of the government and that a speech event cannot be *both* private and governmental at the same time.") (Luttig, J., respecting the denial of rehearing en banc); L. Gielow Jacobs, "Who's Talking? Disentangling Government and Private Speech," 36

*U. Mich. J.L. Ref.* 35, 97 (2002)(observing that specialty license plates contain "a mixture of government and private speech."). Although our analysis in *SCV* anticipated a finding of either government or private speech, our opinion there does not preclude a finding of mixed speech. *See SCV*, 288 F.3d at 618-19 (acknowledging that the four factors do not "constitute an exhaustive or always-applicable list"). My conclusion that the speech is mixed (both government and private) does not end the discussion, however. I must go on to consider whether the State has engaged in viewpoint discrimination and whether it may engage in viewpoint discrimination when the relevant speech is both government and private.

B.

The State contends only in passing that the Act does not discriminate based on viewpoint. As I have indicated, the State's primary argument is that the license plate message, "Choose Life," is State speech because the Act "is the most recent and apparently most visible expression in a long line of statements asserting the State's clear and oft-repeated preference for childbirth over abortion." Appellants' Br. at 19. The State then argues that even if the Act does affect private speech, it is not discriminatory "because [it] does not affirmatively restrict the expression of plaintiffs' preferred viewpoint." *Id.* at 24. This is the argument the State made in opposition to standing, an argument already rejected in part II, above.

The Supreme Court has made clear that the "principal inquiry" in assessing a claim of viewpoint discrimination "is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Ward v. Rock against Racism*, 491 U.S. 781, 791 (1989). *See also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994). A regulation can discriminate based on viewpoint without affirmatively suppressing a certain viewpoint. Discrimination can occur if the regulation promotes one viewpoint above others, *see Rosenberger*, 515 U.S. at 828, and this is precisely what has happened here.

In the license plate forum, South Carolina has authorized the expression of only one position in the abortion debate, thereby promoting the expression of one viewpoint (pro-life) while preventing

the expression of the other viewpoint (pro-choice). By granting access to the license plate forum only to those who share its viewpoint, South Carolina has provided pro-life supporters with an instrument for expressing their position and has distorted the specialty license plate forum in favor of one message, the pro-life message. *See, e.g.*, *Velazquez*, 531 U.S. at 543; *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95-97 (1972). In short, as the district court correctly determined, the Act was adopted because of the State's agreement with the pro-life message. *PPSC*, 236 F. Supp. 2d at 571. South Carolina has therefore discriminated based on viewpoint. *See Rosenberger*, 515 U.S. at 828.

## C.

I next consider whether the State may engage in viewpoint discrimination when the relevant speech is both government and private. Although the Supreme Court has not yet recognized that speech can be governmental and private at the same time, its decisions on government speech and viewpoint discrimination provide instruction on whether the State's viewpoint discrimination in the license plate forum can stand. *See Rust v. Sullivan*, 500 U.S. 173 (1991); *Rosenberger*, 515 U.S. 819; *Velazquez*, 531 U.S. 533. A review of these decisions persuades me that upholding the Act would require an unwarranted extension of the government speech doctrine and of the State's power to promote some viewpoints above others. Although the government may favor certain speech on the basis of viewpoint when it creates and manages its own programs, what South Carolina has done departs from this model in constitutionally significant ways. First, the State has created a limited (license plate) forum for expression, not a government program such as one, for example, that would be carried out through a school, museum, or clinic. Second, the State has favored itself as a speaker within the license plate forum, giving its own viewpoint privilege above others. Third, the State's advocacy of the pro-life viewpoint may not be readily apparent to those who see the Choose Life plate, and this insulates the State's advocacy from electoral accountability. The government speech doctrine was not intended to authorize cloaked advocacy that allows the State to promote an idea without being accountable to the political process.

In *Rust v. Sullivan*, 500 U.S. 173, the Court considered regulations restricting the use of funds by grantees under Title X of the Public

Health Act, 42 U.S.C. §§ 300-300a-6. Title X provided federal funds to clinics that "offer[ed] a broad range of acceptable and effective family planning methods and services," but prohibited the award of funds to clinics with "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. This meant that doctors at funded clinics could not counsel their patients on abortion matters. When the regulations that prohibited abortion counseling and referral were challenged as viewpoint discrimination, the Court upheld them because they were "designed to ensure that the limits of the federal program are observed." *Rust*, 500 U.S. at 193. Because the Title X grant program was designed "not for prenatal care, but to encourage family planning," the Court reasoned, "[a] doctor who wished to offer prenatal care to a project patient who became pregnant could properly be prohibited from doing so because such a service is outside the scope of the federally funded program." *Id.* After noting that the regulations were consistent with the statutory prohibition, the Court concluded that Congress had not restricted speech based on viewpoint, but rather had "merely chosen to fund one activity to the exclusion of another." *Id.* at 193. The Court further explained that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.* at 194. In *Rust* the Court "did not place explicit reliance on the rationale that the counseling activities of the doctors . . . amounted to government speech; when interpreting the holding in later cases, however, [it] . . . explained *Rust* on this understanding." *Velazquez*, 531 U.S. at 541.

*Rust* stands for the principle that when the government creates and manages its own program, it may determine the contents and limits of that program. *See, e.g.*, *Rosenberger*, 515 U.S. at 833; *Velazquez*, 531 U.S. at 541. There is no First Amendment problem, for example, when a public school makes content-based decisions about its curriculum, *see Rosenberger*, 515 U.S. at 833, or when a public museum decides to display one work of art as opposed to another, *see* R. Bezanson & W. Buss, The Many Faces of Government Speech, 86 Iowa L. Rev. 1377, 1422 (2001). The government's broad discretion is justified in such instances because "[w]hen the government speaks . . . to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). Further, "[i]f the citizenry objects, newly

elected officials later could espouse some different or contrary position." *Id. See also* Robert C. Post, "Subsidized Speech," 106 Yale L.J. 151, 164 (1996) ("Managerial domains are necessary so that a democratic state can actually achieve objectives that have been democratically agreed upon."). In short, government speech is necessary to achieve the objectives approved through the ballot box, but the government must remain accountable to the citizenry for what it says. At the same time, as the Supreme Court explains, "[n]either the latitude [allowed] for government speech nor [the] rationale" for that latitude applies to all cases where the government funds speech. *Velazquez*, 531 U.S. at 542. The Court made this clear in both *Rosenberger* and *Velazquez*, two viewpoint discrimination cases.

In *Rosenberger* a public university established a student activities fund (SAF) to reimburse student organizations for the printing costs of their publications. 515 U.S. at 823. The SAF was designed to support a broad range of extracurricular activities that related to the university's educational purpose. The university, however, excluded certain student activities, including religious activities, from receiving SAF funds. *Id.* at 824-25. A Christian student organization that was denied funding for the printing costs of its newspaper challenged the funding exclusion, which the Supreme Court struck down. *Id.* at 825-26. The Court determined that the university, by establishing the SAF, had created a limited public forum for speech, albeit "a forum more in a metaphysical than in a spatial or geographic sense." *Id.* at 830. The university must abide by First Amendment principles, the Court said, "even when the limited public forum is one of its own creation." *Id.* at 829. Specifically, "[w]hen the government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* The Court therefore distinguished government regulation of a limited forum for speech from the typical instance when the State may permissibly promote its viewpoint, such as when it "determines the content of the education it provides" or when (as in *Rust*) it "use[s] private speakers to transmit specific information pertaining to its own program." *Id.* at 833. In *Rosenberger* the student groups that applied for SAF funding were not speaking for the university; they "[were] not the University's agents, [were] not subject to its control, and [were] not its responsibility." *Id.* at 835. Therefore, the Court held that the university could not "silence the expression" of the viewpoints of the groups listed as inel-

igible for SAF funding. *Id.* Though the Court acknowledged that "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created" may justify certain restrictions on its use, it emphasized that those restrictions must be viewpoint neutral and must be reasonable in light of the forum's purpose. *Id.* at 829-30.

In *Velazquez* the Court invalidated a funding restriction under the Legal Services Corporation (LSC) Act that forbade recipients of LSC funds from arguing for a change in existing welfare law. The funding condition required an LSC-funded lawyer to withdraw from representing a client if it turned out that the representation would involve challenging a welfare law. *Velazquez*, 531 U.S. at 539. The government, relying on *Rust*, attempted to justify the funding restriction as "necessary to define the scope . . . of the federal program." *Id.* at 547. The Court rejected this justification. It explained that "[t]he lawyer is not the government's speaker" and that when the government regulates a particular medium — lawyer advocacy in that case — the "accepted usage [of the medium must be considered] in determining whether a particular restriction is necessary." *Id.* at 542, 543. In regulating the advocacy of LSC lawyers, the government had impermissibly attempted to "use an existing medium of expression and to control it, in a class of cases, in ways which distort its usual functioning." *Id.* at 543. The Court further observed that "there is no programmatic message of the kind recognized in *Rust*," concluding that "[t]his serves to distinguish [the challenged regulation] from any of the Title X program restrictions upheld in *Rust*, and to place it beyond any congressional funding condition approved in the past by this Court." *Id.* at 548.

Based on *Rosenberger* and *Velazquez*, I conclude that in assessing the Act, a court must focus not only on the character of the speech, but also on the nature of the medium. The medium here — the speciality license plate scheme — is more like a limited forum for expression than it is like a school, museum, or clinic. Although the State authorizes the sale of license plates with the Choose Life message, the State does not enlist vehicle owners to convey the imprinted message in the way that employees of a government-funded enterprise are enlisted to carry out the programs of that enterprise. *See Rosenberger*, 515 U.S. at 833 (explaining that the government may selectively favor speech based on viewpoint when it "enlists private entities to convey

its own message"). Rather, vehicle owners purchase and display the Choose Life plate because they agree with the message. Thus, because South Carolina has not created a program "of the kind recognized in *Rust*," it cannot justify the Act as "necessary to define the scope and contours" of the license plate scheme. *Velazquez*, 531 U.S. at 547. Instead, because the State has established a license plate forum for the abortion debate, it cannot limit the viewpoints expressed in that forum. *See Rosenberger*, 515 U.S. at 835.

In addition to creating a limited forum for expression, the State has entered that forum as a privileged speaker. South Carolina does not merely approve or deny applications by private organizations for a specialty plate; it has favored its own position by authorizing one plate for those who share its view and by failing to authorize a comparable plate for those who oppose its view. The State thus acts as a privileged speaker within a forum that it created and controls. The Supreme Court has never suggested that the government speech rationale allows a State to dominate a forum in this way, even one of its own creation.

Moreover, the State's role in promoting the Choose Life message is obscured from the public. When a certain viewpoint dominates a speech forum, it should be clear to the public whether that dominance reflects the prevailing view or whether it results from a government restriction. In this case, the pro-life position exclusively dominates the abortion debate in the license plate forum, but the reason for that dominance is not readily apparent to the ordinary citizen. Those who see the Choose Life plate displayed on vehicles, and fail to see a comparable pro-choice plate, are likely to assume that the presence of one plate and the absence of another are the result of popular choice. Specifically, they are likely to assume that there are pro-life residents in South Carolina, but not pro-choice residents, who seek to express their viewpoint in the license plate forum. The State can thereby mislead the public into thinking that it has already won support for the position it is promoting. This possibility thwarts "the rationale behind the government's authority to draw otherwise impermissible viewpoint distinctions in the government speech context," namely, "the accountability inherent in the political process." *SCV*, 288 F.3d at 618.

It might be argued that South Carolina is not hiding its identification with the message on the Choose Life plate because the General Assembly enacted the statute making the plate available. Voters, of course, can always express their approval or disapproval of legislative action through the political process. But this argument overlooks the fact that continuing transparency is essential to accountability. Given the array of specialty license plates available in South Carolina, a citizen is less likely to associate the plate messages with the State. South Carolina authorizes license plates that express support for, among other things, the National Wild Turkey Federation, S.C. Code Ann. § 56-3-3410; saltwater fishing, *id.* § 56-3-7300; adopting homeless pets, *id.* § 56-3-9600; and NASCAR racing, *id.* § 56-3-8710. The array of choices makes the license plate forum appear increasingly like a forum for private speech. As the citizen becomes less likely to associate specialty plate messages with the State, the State's accountability for any message is correspondingly diminished.

Of course, South Carolina could abolish the Choose Life license plate Act that results in mixed speech and adopt "Choose Life" as its state motto. Then the State's identity as speaker would be readily apparent, and the State would be accountable to the public for its support of a particular position. Residents displeased with the State's position could register their displeasure through the electoral process. However, precisely because this is a case of mixed speech, and the identity of the speaker of the Choose Life message is likely to be unclear to viewers of the license plate, government accountability is diminished. South Carolina has placed itself in a position to advocate for a political position while disguising its advocacy as that of private vehicle owners. *See* Jacobs, *supra* at 56-57. ("While the interest of private individuals in speaking anonymously may outweigh listeners' interest in knowing who they are, this same balance does not apply when the government speaks. [The government] can skew the speech market and the basis of its political support in unaccountable ways.") Thus, the State both amplifies the pro-life message and evades scrutiny for its action. Therefore, I conclude that South Carolina has impermissibly favored the pro-life viewpoint by authorizing the Choose Life plate.

I should point out that this result does not render South Carolina powerless to regulate its specialty license plate forum. Because

license plates are publicly displayed and issued by the State, certain restrictions on speech within this forum are reasonable and permissible. *Velazquez*, 531 U.S. at 543; *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687 (1992). For instance, the State may consider content in deciding whether to authorize issuance of a particular plate and may, for example, prohibit patently offensive speech from appearing on license plates. *See, e.g.*, *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001) (upholding Vermont's restriction on offensive scatological terms on vanity plates as viewpoint neutral and reasonable). But South Carolina has not prohibited patent offensiveness here. The State has opened a limited forum for expression, then entered that forum as a covert but dominant speaker, advocating for one viewpoint in the abortion debate without political accountability and without authorizing the expression of the opposing viewpoint. By limiting access to a specialty license plate to those who agree with its pro-life position, the State has distorted the forum in favor of its own viewpoint. This it may not do. *See, e.g.*, *Mosley*, 408 U.S. at 95. In sum, South Carolina has engaged in viewpoint discrimination by allowing only the Choose Life plate, and it has insulated itself from electoral accountability by disguising its own pro-life advocacy. This is prohibited by the First Amendment.

IV.

The Act authorizing the Choose Life plate in South Carolina violates the First Amendment. Accordingly, the district court's judgment invalidating the Act is affirmed.

*AFFIRMED*

LUTTIG, Circuit Judge, concurring in the judgment:

Based upon the reasoning and conclusions set forth in my opinion respecting the denial of rehearing *en banc* in *Sons of Confederate Veterans* v. *Commissioner of the Virginia Department of Motor Vehicles*, 305 F.3d 241, 244 (4th Cir. 2002), I concur in the judgment reached today. In *Sons of Confederate Veterans*, I outlined what I believed were the factual and doctrinal necessities for recognition that some speech acts constitute both private and government speech, notwithstanding that the Supreme Court of the United States had not at that

time (and as yet has not) recognized that a single communicative event may be both private speech and government speech. *See id.* at 244-47. I concluded in that case that vanity license plates are quintessential examples of such hybrid speech. While recognizing that different circumstances may present themselves even in the single context of the vanity license plate, I explained my view that at least where the private speech component is substantial and the government speech component less than compelling, viewpoint discrimination by the state is prohibited.

I expressed the expectation in *Sons of Confederate Veterans* that, when the opportunity arose, this court would further refine its views on the important question of whether a single communicative event can be both private and government speech. Needless to say, I am pleased that the court adopts today the view that speech can indeed be hybrid in character. I believe that, with time, recognition of this external and legal fact will be a contribution to the law, even if different questions must now be resolved over the implications of such a holding.

I am pleased in particular that Judge Gregory, who also wrote in dissent from denial of rehearing *en banc* in *Sons of Confederate Veterans*, 305 F.3d at 252, concurs in the judgment reached today, for I understood him to take a different position in his opinion in that case than the one he takes today. In *Sons of Confederate Veterans*, in an analysis which, if applied here, would *permit* the State of South Carolina to *exclude* the pro-choice message, he reasoned that the First Amendment *permitted* the Commonwealth of Virginia to *exclude* the Confederate flag from the state's license plates, because the Commonwealth of Virginia bore the "ultimate responsibility" for the speech at issue, *id.* at 251 n.2; the Commonwealth had a substantial interest in not being compelled to speak by private citizens, *id.* at 252, being no differently postured in this regard than the "objecting drivers in *Wooley* v. *Maynard*," *id.* at n.4 (citation omitted); the "predominate concern that motivated [the Commonwealth's] enactment" of the statute excluding the Confederate flag was to avoid "speech by attribution," *id.* (citation omitted), which he believed to be a "substantial government interest," *id.* at 252; and there remained open "reasonable alternative avenues" for communication of the excluded message. *Id.* I had been concerned that Judge Gregory would have believed him-

self bound by his reasoning in *Sons of Confederate Veterans* to come to a different conclusion than does he and the court today, and to hold that the State of South Carolina may, permissibly under the First Amendment, exclude the pro-choice message from its license plates because of the state's expressed interest in avoiding association with that message.

Judge Gregory found the panel's opinion deficient in *Sons of Confederate Veterans* in large part because of its "cursory" examination of the factors bearing on the question of whether speech is that of the government or that of private individuals. *Id.* at 251; *see also id.* (describing panel's application of test as "incomplete at best"). In particular, he believed that "there [was] more to be said about the test, including how the factors relate to each other, and the relative weight to be given each factor." *Id.* Judge Gregory does not identify the test that he would apply or explain the details as to how he believes that test would be applied in this case. I infer from his concurrence, however, that he no longer holds to the views expressed in his opinion in *Sons of Confederate Veterans*, and that he has continued to refine his thinking on the difficult issues presented in this case and in *Sons of Confederate Veterans*, as have I and the other members of the court.

GREGORY, Circuit Judge, concurring in the judgment:

In *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 613 (4th Cir. 2002), this Court was asked to determine whether the State of Virginia had a right to disassociate itself from what many Americans, of all races and nationalities, view to be a symbol of racism and slavery—the Confederate flag—by prohibiting the Sons of Confederate Veterans ("SCV") from displaying their organizational logo, which includes the Confederate flag, on state owned and state issued license plates. The panel hearing the case, in a unanimous decision, held that Virginia did not have such a right. *Id.* at 614, 627. To reach this holding, the panel concluded, incorrectly in my view, that only private speech was implicated by Virginia's vanity license plate program. *Id.* at 618-21. Having so concluded, the panel held that Virginia's attempt to balance its interest of not being associated with a highly divisive and controversial symbol with the interest of the SCV in having an orga-

nizational license plate amounted to viewpoint discrimination and was therefore unconstitutional. *Id.* at 622-27.

In a six to five vote, this Court declined to rehear the case *en banc*. *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 305 F.3d 241, 242 (4th Cir. 2002)(denying rehearing *en banc*). In dissenting from that decision, I expressed my belief "that the panel did not fully and adequately analyze the 'government speech' aspect of [the] case." *Id.* at 251 (Gregory, J., dissenting from the denial of rehearing *en banc*). In doing so, I noted that "[w]hat is, and what is not, 'government speech' is a nebulous concept, to say the least," *id.*, because there is a "blurry and sometimes overlapping line between private and government speech." *Id.* at 252. I believe this is especially true with "license plate programs [because they] . . . really have elements of both private *and* government speech." *Id.*

Thus, while I continue to believe that *Sons of Confederate Veterans* was wrongly decided, I am constrained to follow it because it is the law of this Circuit. Accordingly, because I believe the judgment reached today applies the factors set forth in *Sons of Confederate Veterans* in a manner that begins to recognize the government speech interests that are implicated in the vanity license plate forum, I concur in the judgment.