RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

AMERICAN CIVIL LIBERTIES UNION OF TENNESSEE;
PLANNED PARENTHOOD OF MIDDLE AND EAST
TENNESSEE, INC.; SALLY LEVINE; HILARY CHIZ; JOE
SWEAT,

      *Plaintiffs-Appellees,*

  *v.*

PHILIP BREDESEN, Governor of Tennessee; FRED
PHILLIPS, Commissioner of Safety of Tennessee,
      *Defendants-Appellees,*

FRIENDS OF GREAT SMOKY MOUNTAINS NATIONAL
PARK, INC., a non-profit North Carolina
Corporation,
      *Defendant,*

NEW LIFE RESOURCES, INC.,
    *Intervening Defendant-Appellant.*

No. 04-6393

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 03-01046—Todd J. Campbell, District Judge.

Argued: November 2, 2005

Decided and Filed: March 17, 2006

Before: MARTIN, NELSON, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** James Bopp, Jr., BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellant. Julie E. Sternberg, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Jimmy G. Creecy, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. **ON BRIEF:** James Bopp, Jr., Thomas J. Marzen, Anita Y. Woudenberg, BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellant. Julie E. Sternberg, Carrie Y. Flaxman, Caroline M. Corbin, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Jimmy G. Creecy, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, Melody L. Fowler-Green, ACLU FOUNDATION OF TENNESSEE, Nashville, Tennessee, Susan L. Kay, VANDERBILT SCHOOL OF LAW, Nashville, Tennessee, Roger K.

1

Evans, Donna Lee, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, for Appellees.  Mathew D. Staver, LIBERTY COUNSEL, Maitland, Florida, Mary E. McAlister, LIBERTY COUNSEL, Lynchburg, Virginia, for Amicus Curiae.

ROGERS, J., delivered the opinion of the court, in which NELSON, J., joined.  MARTIN, J. (pp. 10-19), delivered a separate opinion concurring in part and dissenting in part.

————————————

**OPINION**

————————————

ROGERS, Circuit Judge.  In this case we are required to decide the constitutionality of Tennessee's statute  making available the purchase of automobile license plates with a "Choose Life" inscription, but not making available the purchase of automobile license plates with a "pro-choice" or pro-abortion rights message.  *See* TENN. CODE ANN. § 55-4-306.  Although this exercise of government one-sidedness with respect to a very contentious political issue may be ill-advised, we are unable to conclude that the Tennessee statute contravenes the First Amendment.  Government can express public policy views by enlisting private volunteers to disseminate its message, and there is no principle under which the First Amendment can be read to prohibit government from doing so because the views are particularly controversial or politically divisive.  We accordingly reverse the judgment of the district court invalidating the statute on First Amendment grounds.

**I.**

Tennessee statutory law authorizes the sale of premium-priced license plates bearing special logotypes to raise revenue for specific "departments, agencies, charities, programs and other activities impacting Tennessee." TENN. CODE ANN. § 55-4-201(j).  The statute authorizing issuance of these license plates earmarks half of their respective profits for named non-profit groups committed to advancing the causes publicized on the plates.  *Id.* § 55-4-215 to -217.

The State of Tennessee takes the other half of the profits.  *See id.* § 55-4-215(a)(2)-(3).  Forty percent (of the total profits) goes to the Tennessee arts commission, while the remaining 10 percent goes to the state's highway fund.  *Id.*  Tennessee will not issue a new specialty license plate until customers place at least one thousand advance orders.  *See id.* § 55-4-201(h)(1).

The Tennessee legislature has determined the price of specialty plates by statute.  In general, they cost the same as a non-specialty plate plus a $35.00 fee (if the government issues the plate on or after September 1, 2002, as in this case).  *See id.* § 55-4-203(d).

In 2003, the Tennessee legislature passed a law (hereinafter "the Act") authorizing issuance of a specialty license plate with a "Choose Life" logotype "designed in consultation with a representative of New Life Resources." *See id.* § 55-4-306(b).  Half of the profits go to New Life Resources, Inc. (New Life).  *See id.* § 55-4-306(c)-(d).  New Life's half "shall be used exclusively for counseling and financial assistance, including food, clothing, and medical assistance for pregnant women in Tennessee." *Id.* § 55-4-306(c).  The Act strictly regulates the precise activities that these profits shall fund.  *See id.* § 55-4-306(d).  It also provides a comprehensive list of dozens of groups that must share in a portion of these profits. *See id.*  It is undisputed that during legislative consideration of the Act, Planned Parenthood of Middle and East Tennessee "lobbied for an amendment authorizing a 'Pro-Choice' specialty license plate . . . , but the measure was defeated." JA 231.

The plaintiffs in this action, the American Civil Liberties Union of Tennessee and others, filed a civil action in federal district court challenging the Act as facially unconstitutional, naming the Governor of Tennessee as defendant. New Life intervened as a defendant. The district court granted summary judgment to the plaintiffs, enjoining enforcement of the Act. The district court held that the authorization of the "Choose Life" license plate was not purely government speech. Relying largely upon Fourth Circuit precedent, the district court held that "both the State and the individual vehicle owner are speaking"—a "mixture" of government and private speech. JA 33-34 (citing *Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 793-94 (4th Cir. 2004); *Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dep't of Motor Vehicles*, 288 F.3d 610, 615 (4th Cir. 2002)). Reasoning that providing for such "mixed" speech is not constitutional if doing so is discriminatory as to viewpoint, the district court found that the statute was clearly discriminatory as to viewpoint and enjoined enforcement of the Act. The district court expressly refrained, however, from reaching the question of whether the entire specialty license plate program was unconstitutional.

New Life appeals. Although the Tennessee state defendants have not appealed, they have filed a brief urging this court not to strike down Tennessee's specialty license plate scheme in its entirety.

## II.

First, the district court was not deprived of subject matter jurisdiction in this case by the Tax Injunction Act (TIA), 28 U.S.C. § 1341, as argued by New Life. New Life claims that the extra cost for a "Choose Life" specialty license plate constitutes a tax that may not, under the TIA, be enjoined by a federal district court if a plain, speedy and efficient remedy may be had in Tennessee courts. Even making the somewhat artificial assumption that it is really the payments that are being challenged in this case,[1] the payments are most closely analogous to payments for simple purchases from the government. Ordinary purchase payments are not taxes under the TIA, and neither is the extra payment for a specialty license plate. It follows that the TIA did not deprive the district court of subject matter jurisdiction in this case.

This conclusion is supported by the longstanding distinction drawn in various legal contexts between taxes and ordinary debts. The Supreme Court for instance explained in *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906):

> Generally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government. We think this exaction is of that character. It is required to be paid by the corporation after organization in invitum.[2] The amount is fixed by the statute, to be paid on the outstanding capital stock of the corporation each year, and capable of being enforced by action against the will of the taxpayer. As was said by Mr. Justice Field, speaking for the court in *Meriwether v. Garrett*, 102 U.S. 472, 513:

---

[1] *Compare Hibbs v. Winn*, 542 U.S. 88 (2004). In *Hibbs*, the Supreme Court held that the TIA did not bar an Establishment Clause challenge to a state income-tax credit for payments to certain organizations that give tuition grants to students attending religious schools. The Court explained that "in enacting the TIA, Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority." *Hibbs*, 542 U.S. at 104-05. The Court also noted that cases applying the TIA generally "involved plaintiffs who mounted federal litigation to avoid paying state taxes (or to gain a refund of such taxes)." *Id.* at 106. Plaintiffs in this case are of course not seeking to avoid paying for a "Choose Life" license plate, and it is therefore at least questionable whether the TIA would apply even if the payment for the license plates were a "tax." We need not reach the issue, however, because of our determination that no tax is involved here.

[2] "In invitum" means "[a]gainst an unwilling person." BLACK'S LAW DICTIONARY 787 (7th ed. 1999).

> "Taxes are not debts. . . . Debts are obligations for the payment of money founded upon contract, express or implied. Taxes are imposts levied for the support of the Government, or for some special purpose authorized by it. The consent of the taxpayer is not necessary to their enforcement. They operate in invitum. Nor is their nature affected by the fact that in some States—and we believe in Tennessee—an action of debt may be instituted for their recovery. The form of procedure cannot change their character."

*See also Fla. Cent. & Peninsular R.R. Co. v. Reynolds*, 183 U.S. 471, 475 (1902) ("tax" defined as "enforced" contribution and distinguished from ordinary contractual debt); *Patton v. Brady*, 184 U.S. 608, 619 (1902) (same); *Alaska Consol. Canneries v. Territory of Alaska*, 16 F.2d 256, 257 (9th Cir. 1926) (same).

The Fifth Circuit has relied upon the definition of tax in *Anderson* to hold that a challenge to the collection of lease rent payments was not subject to the Tax Injunction Act. The Fifth Circuit explained,

> The State contends that the leases are in fact taxes, and thus the federal courts are barred by the Tax Injunction Act, 28 U.S.C. § 1341, from entertaining a challenge to the State's actions to collect on the leases. This contention is without merit. The lease obligations are a creature of contract, not a mandatory obligation imposed by the state as taxes are.

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 500 n.13 (5th Cir. 2001). The analysis would apply a fortiori to ordinary purchases, like the purchase of government bonds, or the purchase of a souvenir at a state park gift store. Such purchase payments can hardly be termed "taxes" as opposed to ordinary payments on voluntary contracts. This conclusion follows, moreover, regardless of what the government does with the sales income.

In this case, Tennessee's sale of specialty plates creates contractual debts to pay but imposes no tax. Instead of using its sovereign power to coerce sales, Tennessee induces willing purchases as would any ordinary market participant. The government confers all the same driving privileges on people who forgo specialty plates to buy standard-issue plates. Drivers' only motive for buying such plates, therefore, must rest with the attractiveness of the "Choose Life" message as Tennessee has marketed it, not a desire to obey Tennessee's will. Under *Anderson* and *Lipscomb*, these sales constitute regular contractual payments, not taxes.

We recognize that there is some case law to the effect that cases like this one are precluded by the Tax Injunction Act. *See Henderson v. Stalder*, 407 F.3d 351, 354-60 (5th Cir. 2005); *NARAL Pro-Choice Ohio v. Taft*, No. 1:05 CV 1064, 2005 U.S. Dist. LEXIS 21394, at *16-*26 (N.D. Ohio Sept. 27, 2005). These cases proceed on the questionable assumption that the applicable test is the one for differentiating between a regulatory fee and a tax. *See generally Hedgepeth v. Tenn.*, 215 F.3d 608 (6th Cir. 2000). This test was created to answer a different question: whether a regulatory fee, often directed to a segregated fund for a special use related to the basis for imposing the fee, is or is not a tax for TIA purposes. *See generally San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683 (1st Cir. 1992). The classic non-tax regulatory fee

> is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

*Id.* at 685 (citations omitted) (Breyer, J.). In contrast, a purchase price cannot be said to be "imposed by an agency upon those subject to its regulation." Instead it is merely a contract price. The test for determining which compelled exactions are taxes and which are fees cannot logically be used to determine whether a payment is a compelled exaction in the first place. Under the Supreme Court's basic definition of a tax, logically applied in *Lipscomb,* the TIA does not preclude federal jurisdiction over the plaintiffs' claims in this case.

Eight judges of the Fifth Circuit accordingly dissented from the denial of rehearing en banc in *Henderson.* 434 F.3d 352 (5th Cir. 2005) (Davis, J. dissenting). In an opinion with which we are in substantial agreement, the dissent acknowledged the accepted test for distinguishing between a regulatory fee and a tax, but explained that "this does not mean that the extra charge for a specialty plate must be one or the other." *Id.* at 355. It does not follow, in other words, that if "the charge is not a regulatory fee . . . it must be a tax." *Id.* Relying in part on the Ninth Circuit's reasoning in *Bidart Brothers v. Calif. Apple Comm'n*, 73 F.3d 925 (9th Cir. 1996), the Fifth Circuit dissent reasoned that, "the relevant question is whether this charge is a tax and if the answer to this question is no, the TIA does not apply regardless of whether the charge is characterized as a regulatory fee, a charitable donation or something else." *Henderson*, 434 F.3d at 355. Thus even though the Fifth Circuit dissent found the charge for the Louisiana "Choose Life" plate not to be a regulatory fee, the charge was not a tax either, in part because "the charge is not 'imposed' by the legislature; because it is entirely optional and voluntary on the part of Louisiana citizens electing to pay the extra charge for a specialty plate." *Id.* at 356.

## III.

On the merits we are faced with a purely legal issue: whether a government-crafted message disseminated by private volunteers creates a "forum" for speech that must be viewpoint neutral. No such requirement applies, at least with respect to state-produced specialty license plates like those at issue in this case.

### A.          *The "Choose Life" Specialty License Plate Bears a Government-Crafted Message*

"Choose Life," as it is to appear on the face of Tennessee specialty license plates, is a government-crafted message. *See Johanns v. Livestock Mktg. Ass'n*, 125 S. Ct. 2055 (2005). *Johanns* stands for the proposition that when the government determines an overarching message and retains power to approve every word disseminated at its behest, the message must be attributed to the government for First Amendment purposes. *See id.* at 2062-66. In this case, *Johanns* requires the court to conclude that "Choose Life" is Tennessee's message because the Act determines the overarching message and Tennessee approves every word on such plates.

In *Johanns*, the Supreme Court held that federal government promotional campaigns to encourage beef consumption constituted government speech because the "message of the promotional campaigns is effectively controlled by the Federal Government itself." *Id.* at 2062. In these campaigns, however, the federal government did not explicitly credit itself as the speaker. *See id.* at 2059 (messages bore the attribution, "Funded by America's Beef Producers").

More specifically, the "message set out in the beef promotions" counted as government speech because "from beginning to end [it is] the message established by the Federal Government." *Id.* at 2062. Congress "directed the implementation of a coordinated program of promotion" that includes paid advertising to advance the "image and desirability of beef and beef products." *Id.* at 2062-63 (internal quotation marks omitted). Congress and the U.S. Secretary of Agriculture enunciated "the overarching message and some of its elements," while leaving the "remaining details to an entity whose members are answerable to the Secretary." *Id.* at 2063. Also, the "Secretary exercises final approval authority over every word used in every promotional campaign."

*Id.* The Supreme Court concluded that when "the government sets the overall message to be communicated and approves every word that is disseminated," it is government speech. *Id.*

*Johanns* supports classifying "Choose Life" on specialty license plates as the State's own message. The Tennessee legislature chose the "Choose Life" plate's overarching message and approved every word to be disseminated. Tennessee set the overall message and the specific message when it spelled out in the statute that these plates would bear the words "Choose Life." TENN. CODE ANN. § 55-4-306. Tennessee, like the Secretary of Agriculture in *Johanns*, leaves some of the "remaining details to an entity whose members are answerable" to the State government. Tennessee delegates partial responsibility for the design of the plate to New Life, but retains a veto over its design. *See id.* § 55-4-306(b). The "Choose Life" plate must be issued in a design configuration distinctive to its category and determined by the commissioner. *Id.* § 55-4-202(b)(2). Thus, Tennessee's statutory law, and its power to withdraw authorization for any license plate, gives the State the right to wield "final approval authority over every word used" on the "Choose Life" plate. As in *Johanns*, here Tennessee "sets the overall message to be communicated and approves every word that is disseminated" on the "Choose Life" plate. It is Tennessee's own message.

Plaintiffs argue that "Choose Life" on specialty plates should be treated not as Tennessee's own message but as "mixed" speech subject to a viewpoint-neutrality requirement. Plaintiffs point to the following undisputed facts to support their view: (1) Tennessee produces over one hundred specialty plates in support of diverse groups, ideologies, activities, and colleges; (2) a private anti-abortion group, New Life, collaborates with the State to produce the "Choose Life" plate; and (3) vehicles are associated with their owners, creating the impression that a "Choose Life" license plate attached to a vehicle represents the vehicle owner's viewpoint. These facts are however consistent with the determination that "Choose Life" on a Tennessee specialty plate is a government-crafted message.

First, there is nothing implausible about the notion that Tennessee would use its license plate program to convey messages regarding over one hundred groups, ideologies, activities, and colleges. Government in this age is large and involved in practically every aspect of life. At least where Tennessee does not blatantly contradict itself in the messages it sends by approving such plates, there is no reason to doubt that a group's ability to secure a specialty plate amounts to state approval. It is noteworthy that Tennessee has produced plates for respectable institutions such as Penn State University but has issued no plates for groups of wide disrepute such as the Ku Klux Klan or the American Nazi Party. Plaintiffs' position implies that Tennessee must provide specialty plates for these hate groups in order for it constitutionally to provide specialty plates supporting any institution. Such an argument falls of its own weight.

Second, as *Johanns* makes clear, the participation of New Life in designing the "Choose Life" logotype has little or no relevance to whether a plate expresses a government message. *See* 125 S. Ct. at 2062-63. In *Johanns* the Supreme Court upheld the beef marketing scheme as government speech even though the development of details was left to an entity "answerable" to the Secretary of Agriculture. *Id.* So long as Tennessee sets the overall message and approves its details, the message must be attributed to Tennessee for First Amendment purposes. *See id.*

Third, *Johanns* also says that a government-crafted message is government speech even if the government does not explicitly credit itself as the speaker. Many of the promotional messages in *Johanns* bore the attribution "Funded by America's Beef Producers." *Id.* at 2059. The Supreme Court explained that the tagline, "standing alone, is not sufficiently specific to convince a reasonable factfinder that any particular beef producer, or all beef producers, would be tarred with the content of each trademarked ad." *Id.* at 2065-66. This was true even though the message was presumably conveyed in private media containing mostly privately-sponsored advertising. In contrast, the

medium in this case, a government-issued license plate that every reasonable person knows to be government-issued, a fortiori conveys a government message.

> B.          *Dissemination of a Government-Crafted Message by Private Volunteers Does Not Create a "Forum" for Speech Requiring Viewpoint Neutrality*

Plaintiffs' most intuitively inviting argument—that the government must be viewpoint neutral when it relies on like-minded volunteers to disseminate its message—cannot in the end invalidate the Act. Plaintiffs point to the following facts to support this aspect of their argument: (a) the government must receive one thousand advance customer orders for the "Choose Life" plate or Tennessee will not manufacture it; (b) the "Choose Life" message is communicated by private citizens' affirmatively purchasing the plates and attaching them to their privately-owned vehicles; (c) the Tennessee government devotes no funds to disseminating the "Choose Life" message, but rather raises money by selling these plates to customers who wish to have "Choose Life" plates on their cars. While it is true that such voluntary dissemination itself qualifies as expressive conduct, the government's reliance on private volunteers to express its policies does not create a "forum" for speech requiring viewpoint neutrality.

This conclusion is supported by negative inference from the one Supreme Court case dealing with license plate speech. In *Wooley v. Maynard*, 430 U.S. 705 (1977), New Hampshire embossed its state motto, "Live Free or Die," on standard-issue license plates in the same way that Tennessee would stamp "Choose Life" on specialty plates. *See id.* at 707. The *Wooley* Court characterized "Live Free or Die" as "the State's ideological message," *id.* at 715, and the State's "official view," *id.* at 717. The Supreme Court held that New Hampshire could not constitutionally prosecute vehicle owners for covering up the motto on their license plates, because by doing so the State would be unconstitutionally forcing automobile owners to adhere to an ideological point of view they disagreed with. Nowhere did the Court suggest that the State's message could not be so disseminated by those who did not object to the State's motto, or even hint that the State could not put the message on state-issued license plates. "Choose Life" is Tennessee's public message, just as "Live Free or Die" communicated New Hampshire's individualist values and state pride. The evil in *Wooley* was that the automobile owners were compelled to disseminate the message; here automobile owners are not only not compelled, they have to pay extra to disseminate the message.

In general, the government does not create a "forum" for expression when it seeks to have private entities disseminate its message. In *Johanns*, for instance, the federal government paid for the "Beef. It's What's for Dinner" message and other promotional messages. 125 S.Ct. at 2059. Although these involved "print and television messages," *id.* at 2059, presumably published or broadcasted by hired private entities, the Court classified this and the rest of the beef promotions as government speech for First Amendment purposes. *See id.* at 2058, 2062-66. Likewise, in *Rust v. Sullivan*, the federal government allocated Title X funds to doctors for family planning counseling but forbade such doctors from discussing abortion with the program's patients. 500 U.S. 173, 178-83 (1991). In *Rust*, the Court recognized that when "the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995) (interpreting *Rust*). If in this case Tennessee drivers were *paid* by the government to display "Choose Life" plates, the Act would unquestionably be constitutional.

In this case, however, the carriers of Tennessee's message are unpaid. They are volunteers. Rather then receiving government money, they pay out of their own pockets for the privilege of putting the government-crafted message on their private property. Plaintiffs argue that this fact demonstrates that "Choose Life" is not purely the government's message but also the speech of the customers who purchase and display these plates—thus creating a "forum" for speech. While it is

true that volunteers' display of "Choose Life" plates expresses agreement with Tennessee, that fact does not mean that a First Amendment "forum" for speech has been created.

The doctors in *Rust* disagreed with the government's anti-abortion policy. But if they had been true believers in the policy and had volunteered to work in the program free of charge, the speech restrictions in *Rust* would still have expressed the government's anti-abortion viewpoint—and therefore qualified for government speech treatment. Similarly, the publications and television stations in *Johanns* that published or broadcasted beef advertisements would have conveyed a government-crafted message even if they had done so for free. There is nothing in the Supreme Court's decisions in *Rust* or *Johanns* that implies that the government has less right to control expressions of its policies when it relies on unpaid private people. No constitutionally significant distinction exists between volunteer disseminators and paid disseminators.

Plaintiffs' view that volunteer dissemination of a government-crafted message creates a "forum," if accepted, would force the government to produce messages that fight against its policies, or render unconstitutional a large swath of government actions that nearly everyone would consider desirable and legitimate. Government can certainly speak out on public issues supported by a broad consensus, even though individuals have a First Amendment right not to express agreement. For instance, government can distribute pins that say "Register and Vote," issue postage stamps during World War II that say "Win the War,"[3] and sell license plates that say "Spay or Neuter your Pets."[4] Citizens clearly have the First Amendment right to oppose such widely-accepted views, but that right cannot conceivably require the government to distribute "Don't Vote" pins, to issue postage stamps in 1942 that say "Stop the War," or to sell license plates that say "Spaying or Neutering your Pet is Cruel."

We cannot affirm the district court in this case without either (1) effectively invalidating all such hitherto-accepted forms of privately disseminated government speech, or (2) distinguishing these examples from the "Choose Life" specialty license plates.

Neither the district court nor the plaintiffs on appeal attempt to articulate a basis for distinguishing these examples. Government-printed pamphlets or pins saying "Register and Vote" or "Buy U.S. Bonds" are clearly government-crafted messages distributed by private individuals who have a First Amendment right not to disseminate them if they don't want to. Postage stamps saying "Win the War" or "Support Our Troops" are clearly government-crafted messages disseminated by private individuals who, under *Wooley*, also presumably have a First Amendment not to buy or use them if they don't want to. And license plates saying for instance "Spay or Neuter your Pets" are even more obviously indistinguishable from the license plates at issue in this case. Indeed, the State of Tennessee in this appeal, not advocating reversal of the district court's injunction but urging us not to invalidate the entire specialty license plate program, offers no tenable basis for drawing a distinction between the dozens of government messages available on Tennessee plates and the "Choose Life" message.

---

[3]*See* Scott Catalogue No. 905 (1942). The example is hardly unusual, as United States postage stamps have carried a variety of government-crafted advocacy messages over the years. Examples include "Give Me Liberty or Give Me Death" (Scott No. 1144 (1961)), "Register and Vote" (Scott No. 1394 (1968)), "Giving Blood Saves Lives" (Scott No. 1425 (1971)), "Organ and Tissue Donation: Share Your Life . . ." (Scott No. 3227 (1998)), and "Breast Cancer, Fund the Fight, Find a Cure" (Scott No. B1 (1998)). *See also* Scott No. 1129 ("World Peace Through World Trade"), No. 1142 ("And this be our Motto, in God is our Trust"), No. 1320 ("We appreciate our Servicemen"), No. 1343 ("Law and Order"), No. 1438 ("Prevent Drug Abuse"), No. 1455 ("Family Planning"), No. 1802 ("Honoring Vietnam Veterans"), No. 1831 ("Organized Labor Proud and Free"), No. 1927 ("Alcoholism You Can Beat It!"), No. 2102 ("Take a Bite out of Crime").

[4]*See* KY. REV. STAT. ANN. § 186.162(2)(y) (2005).

Of course the unstated distinction is that the "Choose Life" message is highly controversial. With respect to the "Choose Life" message, much more than in the above examples, there are large numbers of participants in the public discourse with an opposing view. Such a distinction, however, is entirely indefensible as a matter of First Amendment law, however much it might properly motivate the Tennessee legislature as a matter of policy. Such a distinction would fly in the face of the fundamental free speech principle that views expressed by substantial numbers are treated no differently by the First Amendment than extreme or way-out-of-the-mainstream views. Government speech disseminated by private volunteers, in other words, cannot have its constitutionality under the First Amendment depend on the small number of objectors to the government's message, or the extreme nature of their views.

In the absence of a tenable distinction, invalidating the Act in this case would effectively invalidate not only all those government specialty license plate provisions that involve a message that anyone might disagree with, but also effectively invalidate all manner of other long-accepted practices in the form of government-crafted messages disseminated by private volunteers. We are not provided with a sound legal basis for making such a leap.

We recognize that the Fourth Circuit has invalidated a nearly identical specialty license plate law in South Carolina. *See Planned Parenthood of S.C., Inc., v. Rose*, 361 F.3d 786 (4th Cir. 2004). In *Rose* Judge Michael enunciated a rationale that neither of the other two panel judges joined, although both concurred in the judgment. *See id.* at 800 (Luttig, J., concurring in the judgment); *id.* at 801 (Gregory, J., concurring in the judgment). The reasoning of the Fourth Circuit judges is not persuasive, primarily for two reasons.

First, the Fourth Circuit opinions in *Rose* are in tension with the intervening case of *Johanns*. *Johanns* sets forth an authoritative test for determining when speech may be attributed to the government for First Amendment purposes. *Rose* relied instead on a pre-*Johanns* four-factor test of the Fourth Circuit's own devising that led to an "indeterminate result" on the crucial issue of whether "Choose Life" specialty plates express a government message. *Id.* at 793. The *Johanns* standard, by contrast, classifies the "Choose Life" message as government speech.

Second, none of the separate Fourth Circuit opinions explains how that court would treat such unexceptional examples of government-provided, privately disseminated speech as those described above. Without an articulated basis for distinguishing such examples, following the Fourth Circuit's lead in this case would invalidate wide swaths of previously accepted exercises of government speech. With no Supreme Court case requiring us to take such a step, we decline to do so.

**IV.**

For the foregoing reasons, the district court's order enjoining enforcement of the Act is REVERSED and REMANDED for proceedings consistent with this opinion.

---

## CONCURRING IN PART, DISSENTING IN PART

---

BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part. I concur in the Court's holding that the district court was not deprived of subject matter jurisdiction in this case by the Tax Injunction Act, 28 U.S.C. § 1341. With respect to the merits of the case, I would hold that Tennessee has unconstitutionally discriminated on the basis of viewpoint and would affirm the district court's decision enjoining the Choose Life license plate.[1]

I believe that there are two major flaws with the majority's analysis in this case. First, the majority fails to properly characterize the specialty license plate program. It seems apparent to me that the state created the specialty license plate program to facilitate private speech (notwithstanding the government speech aspects inherent in the issuance of a license plate), and *not* to promote a governmental message. This fact, even conceding that there must necessarily be some governmental speech involved in the issuance of license plates, requires that the government be viewpoint neutral.[2] Second, the majority errs by applying First Amendment compelled speech/subsidy doctrine to a case where, as the majority admits with respect to its analysis of the Tax Injunction Act, *nothing* is compelled. Because we are not dealing with compelled speech or compelled subsidies, I do not believe that the so-called government speech inquiry is wholly determinative of whether the First Amendment has been violated. Although the government may generally speak and control its own message, it may not suppress contrary messages because of their viewpoint in a forum designed to encourage a diversity of views from private speakers.[3]

---

[1] Perhaps of some interest, when this opinion is filed, at least three circuits (4th, 5th, and 6th) will have spoken on the issue, reaching at least three different conclusions, via at least sixteen separate opinions. Additionally, on March 6, 2006, in a non-precedential opinion, the Second Circuit addressed a near identical lawsuit — albeit in a different procedural posture — with the parties in reversed positions. *See Children First Foundation, Inc. v. Martinez*, 2006 WL 544502 (2d Cir. March 6, 2006) (unpublished). The Children First Foundation sued the state of New York when it denied the foundation's application for a Choose Life license plate. According to the foundation, the state committed unconstitutional viewpoint discrimination when it denied the application "based on their disagreement with [the] life-affirming viewpoint expressed by the plate." *Id.* at *1. The district court denied the defendant's motion to dismiss based on qualified immunity and the Second Circuit affirmed. The court noted that the state attempted to justify its decision based on the "government speech doctrine," but held that "custom license plates involve, at a minimum, some private speech" and that "it would not have been reasonable for defendants to conclude this doctrine permitted viewpoint discrimination in this case." *Id.*

[2] *See Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004). The Fourth Circuit has held that specialty license plates embody a mixture of government speech and private speech. *Id.* at 793 (Opinion of Michael, J.) ("[T]he Choose Life plate embodies a mixture of private and government speech."); *id.* at 800 (Luttig, J., concurring in the judgment) ("[V]anity license plates are quintessential examples of such hybrid speech."). I agree that this is an adequate characterization of the nature of the specialty license plate. And, I agree that when faced with such a program, the government must remain viewpoint neutral. I find it more informative, however, to look beyond the specific "Choose Life" plate at issue and examine the purpose of the entire license plate forum. I would not limit my analysis to the inquiry — as the majority here does — of whether the Choose Life license plate alone is government or private speech. I believe that the majority errs in labeling the license plate as pure government speech and I also believe that it errs in not taking into account the nature of the license plate forum.

[3] It also bears mentioning that the State of Tennessee is not even a party to this appeal. The state acquiesced in the district court's decision and has appeared solely in response to the intervenors to request that we not strike down the entire license plate program. The party advocating the Choose Life license plate is a *private* organization.

## I.

A.   *Tennessee's speciality license plate program is a forum designed to encourage private speech, not a government program established to promote a governmental message.*

The majority focuses on the Choose Life license plate without considering the license plate program as a whole and frames the question as "whether a government-crafted message disseminated by private volunteers creates a 'forum' for speech that must be viewpoint neutral." This is itself a loaded question. First, it puts the cart before the horse by already deciding that the message is purely a governmental message. Second, by so phrasing, there is no doubt that the answer is "no." When the government crafts a message and disseminates it, the simple act of the government speaking does not create a forum that invites competing viewpoints. Although the majority answers this question, it is not determinative of the case.[4] Putting aside the question as to whether specialty license plates represent "a government-crafted message" — and I do not believe that they do — the proper question is *not* whether when the government speaks must it always allow others to speak, but whether a forum exists in which speech is occurring, and if so, whether the government may suppress a disfavored message based on its viewpoint.

Thus, I would start by determining the overall purpose of the speciality license plate program. When this is done, viewing the license plate program as a whole, and taking account of the fact that the government engages in speech by providing the actual license plates, it becomes clear that the speciality license plate "program was designed to facilitate private speech, not to promote a governmental message." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). This conclusion, in contrast to the majority's, would require Tennessee's license plate program to be viewpoint neutral.

Tennessee requires all motor vehicles to have a license plate. Motorists can choose from ordinary license plates created by the Tennessee government or they can pay extra for personalized and specialty license plates. There are several standard Tennessee plates and there are approximately 150 specialty plates. As the majority notes, the specialty plates are created in consultation with private organizations and half of the profits may be devoted to the private non-profit organizations sponsoring the plates.

In my opinion, the fact that the state has permitted approximately 150 private organizations to create specialty license plates and the manner in which the state operates its license plate program demonstrates that the forum was created to facilitate private speech. *See Rosenberger*, 515 U.S. at 829-30 (analyzing forum); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98 (2001) (applying forum analysis where private speech occurs on government property); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390-91 (1993) (same); *Sons of Confederate*

---

[4] Moreover, the manner in which the majority presents and answers the question is misleading — are we really to conclude that the Tennessee government has established a program to disseminate all of the individual messages on the various license plates. That is, did the Tennessee government decide to establish a program promoting Penn State Alumni Pride and seek out private volunteers to transmit this message to the public at large? Did the Tennessee government decide to establish a program promoting the University of Florida (the University of Tennessee's arch-rival in football, *see* Gator Hater, http://www.gator-haters.com/Tennessee/index_TN.shtml (last visited March 10, 2006) (a website run by University of Tennessee fans dedicated to their rivalry with the University of Florida, including news, jokes, and recipes for cooking alligator meat)), and does the State seek out private volunteers to promote the University of Florida to its citizens? It is a nice academic exercise to hypothesize that the license plate program is a governmental program to disseminate through private volunteers all of the state's various messages, but it seems to me to be a conclusion that only judges banished to our ivory towers and shut off from the real world could reach. *See also Children First Foundation*, 2006 WL 544502 (holding that no reasonable person would believe that the government speech doctrine permits viewpoint discrimination in the specialty license plate context).

*Veterans, Inc. v. Commissioner of the Va. Dep't. of Motor Vehicles*, 288 F.3d 610, 622 (4th Cir. 2002) (noting that where private speech is at issue, restrictions must be viewpoint neutral regardless of type of forum); *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004) (same). The organizations with specialty license plates are numerous and diverse.[5] The majority claims, however, in concluding that *all* of the license plates are pure government speech, that "there is nothing implausible about the notion that Tennessee would use its license plate program to convey messages regarding over one hundred groups, ideologies, activities, and colleges." There may be nothing implausible about the majority's concept in the abstract;[6] here, however, the evidence is clear that Tennessee wished to create a forum for private speakers. It cannot be ignored that the license plates represent a wide-array of viewpoints, some arguably conflicting, and many not germane to any governmental interest. *See Legal Services Corp.*, 531 U.S. at 543 ("And in *Rosenberger*, the fact that student newspapers expressed many different points of view was an important foundation for the Court's decision to invalidate viewpoint-based restrictions.") (citing *Rosenberger*, 515 U.S. at 836); *Sons of Confederate Veterans, Inc. v. Commissioner of the Va. Dep't. of Motor Vehicles*, 305 F.3d 241, 242-43 (4th Cir. 2002) (Williams, J., concurring in the denial of rehearing en banc) ("In essence, the Commonwealth has opened its license plates to myriad private speakers but wishes to restrict the message one of those speakers would express based on its disagreement with the viewpoint contained therein.").

In addition to acknowledging the viewpoints already expressed in the forum, it is helpful to look at how Tennessee actually operates the forum in practice. First, the State's own application for a "personalized," "specialty," or "special" license plate advertises, "SHOW *YOUR* SCHOOL SPIRIT" (emphasis added) and "SUPPORT *YOUR* CAUSE AND COMMUNITY." (emphasis added). It does *not* say, "SUPPORT THE GOVERNMENT'S MESSAGE." Additionally, a June 22, 2005 press release from the Governor's office informs that the state "currently issues nearly 150 different license plates to reflect *drivers'* special interests, such as schools, wildlife preservation, parks, the arts and children's hospitals." (emphasis added).[7]

---

[5]The plates include for "Clubs/Groups": Alpha Kappa Alpha, Alpha Phi Alpha, Delta Sigma Theta, Ducks Unlimited, Fraternal Order of Police, Int'l Assoc. of Firefighters, Kappa Alpha Psi, Mothers Against Drunk Driving, Masons, Omega Psi Phi, Phi Beta Sigma, Tennessee Police Benevolent Association, and Zeta Phi Beta. Under "Military/Veterans": Bosnia Veteran, Bronze Star Meritorious, Bronze Star Valor, Desert Storm Veteran, Disabled Veteran, Enemy Evadee, Handicapped Veteran, Honorably Discharged Veteran, Korean War Veteran, Legion of Valor, Medal of Honor, Military, National Guard, Pearl Harbor Survivor, Prisoner of War, Purple Heart, Silver Star, Vietnam Veteran, and WWII Veteran. Collegiate Plates include: Alabama, APSU, Arkansas, Auburn, Belmont, Bryan College, Carson-Newman, Clemson University, Cumberland, ETSU, Florida State, Freed-Hardeman, Georgia Tech, Indiana, Kentucky, King College, Lane College, Lee University, LeMoyne-Owen, Lipscomb University, Maryville College, Memphis, Milligan College, Mississippi State, MTSU, Penn State, Purdue University, Rhodes, Tennessee Tech, Tennessee Wesleyan, Trevecca Nazarene, TSU, Tusculum College, Union, University of Florida, University of Mississippi, University of the South, UT-Chattanooga, UT-Generic, UT-Knoxville, UT-Martin, Vanderbilt, and Virginia Tech. Miscellaneous plates include: American Eagle Foundation, Agriculture, Animal Friendly, Antique, Automobile/Motor Home, Children First, Consular, East Tennessee Children's Hospital, Environmental, Fish and Wildlife Species - Bear, Fish and Wildlife Species - Turkey, Friend of the Smokies, Helping Schools, Le Bonheur Children's Medical Center, Prince Hall Masons, Radnor Lake, Sons of Confederate Veterans, Sportsman, St. Jude, Tennessee Arts Commission (Cat, Fish, or Rainbow), Tennessee Walking Horse, U.S. Olympic, UT Football Championship, Lady Vols Championship, Vanderbilt Children's Hospital, and Watchable Wildlife. *See* Tennessee Department of Safety, *Speciality Plates Main Menu*, *available at* http://state.tn.us/safety/plates.html (last visited March 10, 2006). *See also* Tenn. Code Ann. § 55-4-202.

[6]I wonder whether there is a number at which the majority would concede that private speech is at work. Maryland has approximately 500 different specialty license plates. Would that be enough to demonstrate that the state is encouraging private speech?

[7]It is also curious that the government, if it wished to speak and promote a message, would first require at least 1,000 individuals to pay the government before it agreed to disseminate the message. *See also Sons of Confederate Veterans*, 288 F.3d at 620 ("If the General Assembly intends to speak, it is curious that it requires the guaranteed

I would contrast specialty plates with Tennessee's own plates where it does intend to convey a governmental message. For example, a new Tennessee plate issued in January 2006 was issued because "[Governor] Bredesen felt strongly [that the plate] should reflect the natural beauty of the state." Press Release, *available at* http://tennessee.gov/safety/newsreleases/newplate.htm (last visited March 10, 2006). Bredesen stated that he wanted "this new plate to reflect the magnificence of our state, as well as to serve as a symbol of the pride Tennesseans feel to live on such a beautiful land." That same press release notes that "[t]he Tennessee Department of Safety issues approximately 5.4 million passenger auto plates each year . . . . In addition, the state currently issues nearly 150 different license plates to reflect *drivers' special interests*, such as schools, wildlife preservation, parks, the arts and children's hospitals." *Id.*

Although there may be nothing "implausible" about a government establishing a license plate program in order to promote purely governmental messages, I believe the majority ignores the reality of the situation here — Tennessee is not promoting its own messages, but rather has "expend[ed] funds [or provided governmental property in the form of the license plate itself] to encourage a diversity of views from private speakers." *Legal Services Corp.*, 531 U.S. at 542 (quoting *Rosenberger*, 515 U.S. at 834).[8] In this case, "[a] page of history is worth a volume of logic." *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.).

> B.       *The majority errs by applying the compelled speech/subsidy doctrine in a case where nothing is compelled.*

Aside from having mischaracterized the purpose of the specialty license plate program, the majority also applies the wrong First Amendment doctrine. For purposes of the Tax Injunction Act inquiry, the majority properly concludes that the payments for specialty license plates are voluntary and not compelled. Nevertheless, when it turns to the merits of the First Amendment inquiry, the majority ironically treats this case as if it were a *compelled* speech or compelled subsidy case. I part ways with the majority because it I do not agree that *Johanns v. Livestock Mktg. Ass'n*, 125 S. Ct. 2055 (2005) is controlling, and the majority relies almost exclusively on *Johanns*. The majority apparently takes *Johanns* to mean that the sleeping doctrine of "government speech" has been awakened and now controls all First Amendment analysis. I disagree.

*Johanns* is a case that addresses *compelled* subsidies — that is, the government forced someone to give it money to pay for speech. In *Johanns*, the Supreme Court described the "two categories of [compelled speech] cases." *Id.* at 2060. The first category is true compelled speech cases — i.e., cases where "an individual is obliged personally to express a message he disagrees with, imposed by the government." *Id.* In this category, the Court has taken a strong stand and invalidated "outright compulsion." *Id.*; *see West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624

---

collection of a designated amount of money from private persons before its 'speech' is triggered."). In fact, in this case, Tennessee does not expend any funds of its own. The entire license plate is funded by the private purchasers. All that Tennessee provides is the medium — the actual metal license plate — for the groups to design and display their messages. And in providing this medium, the government has created a means by which favored groups can promote their messages and raise funds, but the government has prevented a disfavored group from having the same access to the forum. Contrary to the majority's suggestion, however, adopting this approach does not mean that the state has to authorize a plate for every individual or group that requests one. The state may adopt reasonable and viewpoint neutral regulations to administer the license plate program in a manner consistent with the program's objectives.

[8] Although I would not necessarily find the following points controlling, there is also additional support for my conclusion that the messages are not governmental in nature. Many of the messages are not germane to governance (for example, the plates promoting antiques, numerous out-of-state universities, Ducks Unlimited, and various others). The Fellowship of Christian Athletes may beg other First Amendment questions if it is *promoted* by the government. I would also question whether Tennessee wishes to *promote* the Sons of Confederate Veterans plate, bearing the Confederate Flag as its design. I find it telling that in this appeal, the state did not claim to be "promoting" these messages.

(1943) (prohibiting state from requiring schoolchildren to recite the Pledge of Allegiance while saluting the American flag, on pain of expulsion); *Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that requiring the plaintiffs to bear the state's motto, "Live Free or Die," was impermissible compulsion of expression). The second category of cases is compelled subsidy cases — that is, cases "in which an individual is required by the government to subsidize a message he disagrees with." *Johanns*, 125 S. Ct. at 2060. There are two subcategories to the compelled subsidy cases: (a) compelled subsidies to support a *private* entity's political message, *see Keller v. State Bar of Cal.*, 496 U.S. 1 (1990); *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977), and (b) compelled subsidies to support the *government's* message. It is in this subcategory — compelled subsidies to support the government's message — that *Johanns* fits.[9] Thus, in compelled subsidy cases, the determinative issue is whether the speech is the government's (which is immune from First Amendment challenge) *or* a private entity's speech, which is unconstitutional, *see Keller*, 491 U.S. 1; *Abood*, 431 U.S. 209.

The reason is simple when one thinks of what the First Amendment harm is in each situation. When there is a compelled subsidy, the harm is being forced to give the government money to pay for someone else's message. When that message is another private message (despite tangential government involvement), the First Amendment is violated. *See Keller*, 496 U.S. 1; *Abood*, 431 U.S. 209; *see also* 5 The Founders' Constitution, § 37, A Bill for Establishing Religious Freedom, p. 77 (1987), codified in 1786 at Va. Code Ann. § 57-1 (Lexis 2003) (where in 1779, Thomas Jefferson wrote that "to compel a man to furnish contributions of money for the propogation of opinions which he disbelieves, is sinful and tyrannical"). When the message is the government's own, however, the harm is alleviated for First Amendment purposes. This is because, of course, the government must be able to tax and spend in order to function. *See Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000) ("The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies."); *see also Keller*, 496 U.S. at 12-13 ("If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed."). The First Amendment harm in this case, however, has nothing to do with being forced to speak or to subsidize a message. Rather, the harm is being denied the opportunity to speak on the same terms as other private citizens within a government sponsored forum. In this situation, whether the particular Choose Life message is the government's own or private speech, the First Amendment harm is not alleviated for the persons denied access.[10] Thus, the government speech doctrine, a la *Johanns*, is not the determinative question in this case. The specialty license plate issue at hand does not involve compelled speech. It does not involve a compelled subsidy for a private entity. And, it does not involve a compelled subsidy to support a government message.

The majority here, however, extrapolates the so-called government speech doctrine from the compelled subsidy context of *Johanns*, and applies it, apparently, without limit, in all First Amendment cases. I disagree with this approach. First, if the majority's analysis applied to *Barnette*, *Wooley*, *Keller*, and *Abood*, the outcomes of all of those cases certainly could have been

---

[9] *See also United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001) ("First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors . . .").

[10] This is particularly why the question is not whether a hypothetically government-sponsored message itself "creates" a forum. When the majority answers "no" to the misleading question it poses, the proper First Amendment question is still not answered because there are another one-hundred fifty other private speakers in the broader license plate forum.

different. The majority here found several facts relevant to its decision. First, the government "crafted" the message. The same could be said in the earlier cases. The Pledge of Allegiance is the government's message. New Hampshire's government "crafted" its own motto. Based on the majority's broad interpretation of government involvement in speech, the fact that the government compelled membership and dues payments in *Keller* and *Abood*, could be interpreted to fall within the majority's understanding of government speech. The government had ultimate control over all of these messages. In each of those cases, the facts the majority found relevant here would indicate that the message was the government's own. But, this was not the approach the Supreme Court took, and I would not take it here either, because it ignores the First Amendment interests at issue.

The government speech doctrine, as it is used in *Johanns*, is more appropriately utilized in the compelled subsidy context, where who is speaking is determinative, and if it is the government, consistent with its broad taxing authority, that speech is immune from First Amendment challenge. *Johanns*, 125 S. Ct. at 2068 (Souter, J., dissenting) ("[T]he Government argues here that the beef advertising is its own speech, exempting it from the First Amendment bar against extracting special subsidies from those unwilling to underwrite an objectionable message.").[11] Thus, if the plaintiffs here, who presumably disagree with the "Choose Life" message, were *compelled* to subsidize the production and distribution of "Choose Life" license plates, then *Johanns* would be on all fours with this case.[12] We face an entirely different situation, however, and therefore *Johanns* is not determinative.

   C.     *The "government speech" doctrine does not permit viewpoint discrimination when the government encourages a diversity of views from private speakers.*

The Supreme Court's precursor cases to *Johanns*, *Rust v. Sullivan*, 500 U.S. 173 (1991) and *Legal Services Corp.*, are instructive, as well as the Court's viewpoint discrimination cases. The majority briefly considers *Rust*, but misinterprets its holding and improperly applies it to this case. In *Rust*, Congress established Title X of the Public Health Service Act, "which provides federal funding for family planning services." *Id.* at 178. The Act authorizes the Secretary of the Department of Health and Human Services to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." *Id.* (quoting 42 U.S.C § 300(a)). Thus, in *Rust*, Congress established a federal program

---

[11]Justice Souter noted that while the government speech doctrine is in its early stages of development, two points are clear: "The first point of certainty is the need to recognize the legitimacy of government's power to speak despite objections by dissenters whose taxes or other exactions necessarily go in some measure to putting the offensive message forward to be heard." *Id.* at 2070 (Souter, J., dissenting); *id.* (discussing government's need to avoid "heckler's veto of any forced contribution"). "The second fixed point of government-speech doctrine is that the First Amendment interest in avoiding forced subsidies is served, though not necessarily satisfied, by the political process as a check on what government chooses to say." *Id.* at 2070-71 (Souter, J., dissenting); *id.* at 2071 (discussing "[t]he adequacy of the democratic process to render subsidization of government speech tolerable"). *Johanns* is very clearly about targeted assessments and forcing those who disagree with a particular message to *fund* it.

[12]The majority is mistaken therefore, in reading *Johanns* as a watershed First Amendment case. It may be a watershed *compelled subsidy* case, but it is not revolutionary and does not transform all First Amendment doctrine. The *Johanns* dissent is instructive on this point. The contention was not over whether the government can ever compel a subsidy for its own message — it can — but over the concept of transparency. That is, when the government speaks, must it identify itself clearly as the speaker? *Id.* at 2069 (Souter, J., dissenting) ("The error is not that government speech can never justify compelling a subsidy, but that a compelled subsidy should not be justifiable by speech unless the government must put that speech forward as its own."); *id.* at 2072 (asserting that transparency requires knowing whether "Uncle Sam is the man talking behind the curtain"); *id.* at 2073 ("It means nothing that Government officials control the message if that fact is never required to be made apparent to those who get the message, let alone if it is affirmatively concealed from them.").

which allowed the Secretary to provide *grants* to family planning projects that complied with the terms of the grants.

The Court rejected the plaintiffs' First Amendment claim stating that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 193; *id.* (noting that the government "has merely chosen to fund one activity to the exclusion of the other"). Thus, restrictions imposed upon federal grants, are permissible in certain circumstances when simply "designed to ensure that the limits of the federal program are observed." *Id.*; *but see Legal Services Corp.*, 531 U.S. 533. The Court characterized the case, not as one where the government seeks to suppress an idea, but rather a "prohibition on a project grantee or its employees from engaging in activities outside of the project's scope." *Rust*, 500 U.S. at 194. Thus, "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.*

The Court focused on the fact that the program at issue involved a federal *subsidy*. *Id.* at 199 n.5 ("First, Title X subsidies are just that, subsidies."). Consequently, the complaining parties in *Rust* could simply have declined to accept federal assistance. But, by voluntarily accepting federal monies, "a recipient voluntarily consents to any restrictions placed on any matching funds or grant-related income." *Id.*

Contrary to the majority's insinuation here, the holding of *Rust* is not limitless and the Supreme Court itself explicitly stated as much. The Court stated that its holding was "not to suggest that funding by the Government, even when coupled with the freedom of the fund recipients to speak outside the scope of the Government-funded project, is invariably sufficient to justify Government control over the content of expression." *Id.* at 199. Accordingly, the Court "has recognized that the existence of a Government 'subsidy,' in the form of Government-owned property, does not justify the restriction of speech in areas that have 'been traditionally open to the public for expressive activity.'" *Id.* at 199-200 (quoting *United States v. Kokinda*, 497 U.S. 720, 726 (1990) (additional citations omitted)). It proves too much to suggest, as the majority does, that any government involvement in speech turns that speech into government speech immune from First Amendment restrictions. Thus, Tennessee's license plate program falls not within the broader holding of *Rust*, but within the Court's caveat that the government, despite some involvement and despite providing a subsidy of sorts (here, providing the license plates for the messages), may not restrict speech in areas it has designed to facilitate private speech.

The Court later resolved a similar question in *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), where it addressed the Legal Services Corporation Act. The Act established the Legal Services Corporation whose "mission is to distribute funds appropriated by Congress to eligible local grantee organizations 'for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance.'" *Id.* at 536 (quoting 42 U.S.C. § 2996b(a)). The grants provided contained a restriction that prohibited "legal representation funded by recipients of LSC moneys if the representation involves an effort to amend or otherwise challenge existing welfare law." *Id.* at 536-37. The plaintiffs challenged the restriction, arguing that it constituted impermissible viewpoint discrimination in violation of the First Amendment. The United States relied upon *Rust v. Sullivan*.

The Court noted that in *Rust*, it "did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech" but "when interpreting the holding in later cases, however, [the Court] ha[s] explained *Rust* on this understanding." *Id.* at 541. The Court acknowledged that viewpoint based *funding* decisions can be sustained where "the government is itself the speaker" or, "like *Rust*" where the government "used private speakers to transmit specific information pertaining to its own program." *Id.* (citations

and quotations omitted). The majority here latches onto the idea that Tennessee is using private speakers to disseminate its Choose Life message — that is, the license plate program is "like *Rust*." As I have discussed above, however, *Rust* included a caveat that the majority fails to acknowledge. Because of that failure, the majority does not properly characterize the specialty license plate program, and it does not properly consider whether the specialty license plate forum has been traditionally open to the public for expressive activity. *Rust*, 500 U.S. at 199-200.

As the Supreme Court held, contrary to the majority's belief here, "[n]either the latitude for government speech nor its rationale applies to subsidies for private speech in every instance, however. As we have pointed out, '[i]t does not follow . . . that viewpoint-based restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.'" *Id.* at 542 (quoting *Rosenberger*, 515 U.S. at 834). Distinguishing *Legal Services Corp.* from *Rust*, the Court stated that "the salient point is that, like the program in *Rosenberger*, the LSC program was designed to facilitate private speech, not to promote a governmental message." *Id.* So too, the salient point here is that the license plate program was designed to facilitate private speech and to encourage a diversity of viewpoints from private speakers, not to promote a governmental message. "The state would argue that its viewpoint discrimination is permissible, because its license plates constitute pure government speech. But the speech here only becomes speech by virtue of a citizen's choice." *Planned Parenthood of South Carolina v. Rose*, 373 F.3d 580 (4th Cir. 2004) (Wilkinson, J., concurring in the denial of rehearing en banc); *see also Women's Emergency Network v. Bush*, 323 F.3d 937, 945 n.9 (11th Cir. 2003) ("Furthermore, the program is structured to benefit the organizations that apply for and sponsor the plates, not the State itself. We fail to divine sufficient government attachment to the messages on Florida specialty license plates to permit a determination that the messages represent government speech."). The majority dodges this point by looking at the license plate program as if the Choose Life license plate were the only plate in the entire state of Tennessee. That way, the majority characterizes the Choose Life plate as an isolated instance of a government message disseminated by private volunteers without considering the program as a whole. If we think of each individual license plate in a vacuum, each one can be reasonably characterized as a government message. But, in order to properly characterize the specialty license plate program for First Amendment purposes, we cannot view each license plate in isolation. I suggest that when opening one's eyes to the license plate program as a whole, it is evident that the government has created a program to encourage a diversity of views and messages from private speakers.

## II.

With the preceding First Amendment doctrine issues in mind, I would hold that Tennessee created a forum to encourage a diversity of viewpoints from private speakers and therefore the Constitution requires viewpoint neutrality. In *Rust*, "the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program." *Rosenberger*, 515 U.S. at 833 (describing *Rust*). This is not a *Rust* case despite the majority framing it as such. *See also Sons of Confederate Veterans*, 305 F.3d at 246 (Luttig, J., respecting the denial of rehearing en banc) ("When a special license plate is purchased, it is really the private citizen who engages the government to publish *his* message, not the government who engages the private individual to publish *its* message, as in cases like *Rust v. Sullivan*[] and *Wooley v. Maynard*, for example.").

The specialty license plate program itself has been open and available to a wide-range of private speakers to promote their own messages. The government's participation in the process by providing the actual license plate "in the form of Government-owned property, does not justify the restriction of speech in areas that have been traditionally open to the public for expressive activity." *Legal Services Corp.*, 533 U.S. at 199-200 (internal quotation marks and citation omitted).

Moreover, the government speech rationale does not apply whenever the government somehow has its hands or its money involved. "It does not follow . . . that viewpoint-based restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 542 (quoting *Rosenberger*, 515 U.S. at 834); *see also Sons of Confederate Veterans*, 305 F.3d at 246 (Luttig, J., respecting the denial of rehearing en banc) ("No one, upon careful consideration, would contend that, simply because the government owns and controls the forum, all speech that takes place in that forum is necessarily and exclusively government speech. Such would mean that even speech by private individuals in traditional public fora is government speech, which is obviously not the case.").

Finally, I also cannot subscribe to my colleagues' melodramatic doomsday predictions about what would occur should we hold that the Constitution requires that Tennessee's specialty license plate program be viewpoint neutral. The majority claims that viewpoint neutrality will require the state to issue Ku Klux Klan and American Nazi Party specialty license plates. The simple answer in response to this suggestion is: Well of course that's true if viewpoint neutrality means anything. That is the same reason that Tennessee cannot prevent the KKK or Nazi Party from getting parade licenses on the same terms as other groups and the same reason that Tennessee cannot prevent these groups from espousing their views in the town squares.

Additionally, what my colleagues seem to miss, is the fact that Tennessee *already* authorizes a Sons of Confederate Veterans license plate bearing the emblem of the Confederate Flag. To some, the Confederate flag is a symbol of pride in one's heritage. *See Sons of Confederate Veterans*, 305 F.3d at 242 (Wilkinson, C.J., concurring in the denial of rehearing en banc) (noting that some people "view the Confederate flag as symbolically celebrating their line of descent"). To many others, however, the Confederate flag is a symbol that is just as offensive as the examples my colleagues put forth. *See Storey v. Burns Int'l Security Services*, 390 F.3d 760, 763 n.5 (3d Cir. 2004) ("One of the Confederacy's key beliefs, as its Constitution readily asserted, was the interminable white man's right to own black slaves. The battle flag of the Confederacy, then, [can be interpreted as] an exclusionary message that stigmatizes blacks as outsiders of the political community.") (quoting Alexander Tsesis, *The Problem of Confederate Symbols: A Thirteenth Amendment Approach*, 75 Temp. L. Rev. 539, 557 (2002) (footnotes omitted)); *see also Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 822-24 (4th Cir. 2004) (en banc) (Gregory, J., concurring) ("Moreover, common sense suggests that such problems are not readily resolved merely because symbols such as a Confederate flag may be accompanied with slogans such as 'heritage not hate,' because a symbol's significance often lies 'in the eye of the beholder.' [T]o its supporters at the time of its creation as well as some proponents today . . . the Confederate flag undeniably represented, and represents, support for slavery, . . . and opposition to the Republic."). The majority's invocation of KKK and Nazi Party license plates is a red herring.

Moreover, Tennessee can constitutionally maintain viewpoint neutral regulations, such as the one already in place requiring at least 1,000 paid specialty plate orders before a plate is issued. *See Good News Club*, 533 U.S. at 106-07 (discussing the difference between subject matter regulations and viewpoint discrimination). If the KKK and Nazi Party are able to pull together 1,000 proud, dues-paying members, who wish to display such license plates on their cars, however, they are entitled to do so the same as the Sons of Confederate Veterans, Penn State Alumni, antique afficionados, and members of pro-life and pro-choice organizations. There is also no evidence that the doomsday scenario the majority predicts has occurred in the Fourth Circuit. The government has not ceased to function. The state governments are not inundated with frivolous license plate proposals. The roads are not overcrowded with KKK license plates and license plates advocating reckless pet breeding.

In raising such examples as my colleagues do here, they seem to forget about the core purpose of the First Amendment. "[T]he First Amendment was not written for the vast majority of [Tennesseans]. It belongs to a single minority of one." *Sons of Confederate Veterans*, 305 F.3d at 242 (Wilkinson, C.J., concurring in the denial of rehearing en banc). That currently disfavored messages are entitled to First Amendment protection should come as a shock to no one. In this case, the Choose Life message could easily have been Pro-Choice and the positions of the parties reversed. *See Children First Foundation*, 2006 WL 544502 (choose life organization suing state and arguing that viewpoint neutrality is required in specialty license plate forum); *Planned Parenthood of South Carolina*, 373 F.3d at 581 (Wilkinson, J., concurring in the denial of rehearing en banc). The First Amendment principles, however, remain the same.

## III.

For the foregoing reasons, I would affirm the district court's decision enjoining the issuance of the Choose Life license plate.